UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
PHILIP GRANT,

                           Plaintiff,                              MEMORANDUM AND ORDER
                                                                   15-CV-3635 (ILG) (ST)

        - against -

CITY OF NEW YORK,
DETECTIVE EVELIN GUTIERREZ,
DETECTIVE NIURCA QUINONES,
Shield #3310,
DETECTIVE MARIBEL ROMAN,
Shield #5530, and
LIEUTENANT  COMMANDER
PATRICK MONTAGANO,

                           Defendants.
---------------------------------------------------------x
GLASSER, Senior United States District Judge:

        Plaintiff Philip Grant brings this action, pursuant to 42 U.S.C. § 1983 and state law,

against Defendants City of New York (the **"City"**), Lieutenant Commander Patrick Montagano

and Detectives Evelin Gutierrez, Niurca Quinones and Maribel Roman for false arrest, malicious

prosecution and deprivation of due process of law. (ECF No. 17). Before the Court is

Defendants' motion for summary judgment on all claims. (ECF No. 41). For the reasons that

follow, the motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

        In the early hours of August 27, 2013, a woman, referred to herein as "Jane Doe," was

robbed and sexually assaulted near Evergreen and Bleecker Avenues in Brooklyn. (Def. Ex. H

(Complaint Room Screening Sheet)).[1] Shortly after the attack, Jane Doe told police that her

---

[1] As used herein, "Def. Ex." refers to the exhibits attached to the declaration of Melanie Speight
in support of Defendants' motion for summary judgment (ECF No. 44).

1

assailant was an African-American man, approximately 5'6" to 5'8" in height, 30 to 40 years old, with "deformed or big teeth." (Def. Ex. I (Gutierrez DD5, No. 2)).[2] Plaintiff was arrested and prosecuted for the crime before the charges were ultimately dismissed.

Before a chronology of the facts is given, mention must be made of the significant differences between Plaintiff's physical appearance and that of the suspect. Plaintiff is 6'5" tall. (Def. Ex. O (Arrest Report); Grant Dep. at 18:21-22). He was 58 years old when he was arrested. (Def. Ex. O; Grant Dep. at 18:1-2). He does not have "deformed teeth," or indeed any facial deformity (Roman Dep. at 122:21-123:2), and Plaintiff's arresting officer herself admitted that she did not think he looked like the composite sketch of the suspect (*id*. at 141:3-6). In addition, Plaintiff walks with a limp due to an injury he sustained several years before these events. (*Id*. at 114:14-15; Grant Dep. at 33:9-34:25). At the time of arrest, the detectives were in possession of a video of the attacker, which showed that he was much younger and shorter than Plaintiff and that he did not walk with a limp. (Def. Ex. W (Proceedings, Ind. No. 7712/13 (N.Y. Sup. Ct., Kings County Jul. 25, 2014)) at 4:19-24).[3] The record points to no physical similarity

---

[2] Both sides rely heavily on complaint follow-up reports, also known as "DD5's," for the truth of the statements made therein. Neither party has objected to the other party's reliance on these DD5's pursuant to Fed. R. Civ. P. 56(c)(2). Accordingly, the Court will treat as waived any argument on hearsay grounds that these DD5 reports may not be considered for purposes of summary judgment. *See Thomsen v. Kefalas*, No. 15-CV-2668, 2018 WL 1508735, at *14 (S.D.N.Y. Mar. 26, 2018).

[3] On July 25, 2014, a hearing was held in New York Supreme Court, Kings County, in which the prosecutor described the contents of the video on the record. (Def. Ex. W). Plaintiff heavily relied on this transcript in his opposition papers (ECF No. 47, at 7, 12, 24), and Defendants never objected to it pursuant to Rule 56(c)(2). Accordingly, any argument that this transcript is inadmissible hearsay for summary judgment purposes is waived. *See Thomsen v. Kefalas*, No. 15-CV-2668, 2018 WL 1508735, at *13 (S.D.N.Y. Mar. 26, 2018); *Jones v. Western Tidwater Regional Jail*, 187 F.Supp.3d 648, 654 (E.D. Va. 2016); *Krishtul v. VSLP United, LLC*, No. 10-CV-0909, 2012 WL 13098290, at *7 n. 5 (E.D.N.Y. Jun. 11, 2012).

whatsoever between Plaintiff and the suspect other than the fact that they are both African-American. (Def. Exs. I, O).

In the days following the attack, an investigation was conducted by Defendants Gutierrez, Roman and Quinones of the Brooklyn Special Victims Squad. Defendant Montagano was the commanding officer of that squad at the time. (Montagano Dep. at 23:17-20). The detectives obtained surveillance footage that showed Jane Doe being followed by an unknown man, presumably her attacker. (Roman Dep. at 76:11-14). In addition, a composite sketch of the attacker was drawn, which Roman placed at various locations throughout the area. (*Id*. at 89:7-91:12). The manager of a local grocery recognized the man in the sketch as one of his customers, noting that there was "something wrong with his face" (Pl. Ex. 13 (Roman DD5)),[4] but it does not appear that the detectives pursued this lead any further.

Plaintiff's name surfaced on September 3, 2013, after Gutierrez and Roman encountered a woman named Alfreda Darvey while canvassing the area of the crime. (Def. Ex. K (Gutierrez DD5, No. 25))*.* The detectives asked her whether she knew of a "tall" black man who frequented the area. (*Id.*). As previously mentioned, the detectives had no reason to believe that the suspect was "tall," as the victim described him as between 5'6" and 5'8". There is no indication that Darvey was given descriptors such as the suspect's facial deformity or age. (*Id.*; Roman Dep. at 72:12-14). Darvey told the detectives that the person they were looking for "could be Phil" and indicated that "Phil" lived on 11 Stanhope Street (Def. Ex. K; Roman Dep. at 72:3-5, 73:16-19,

---

[4] As used herein, "Pl. Ex." refers to the exhibits attached to the declaration of Nicole Bellina in opposition of Defendants' motion for summary judgment (ECF No. 49).

75:4-7).[5] Darvey was never shown the sketch or the video of the suspect. (Roman Dep. at 141:19-142:2, 142:14-16).

Based on the information provided by Darvey, the detectives learned that Plaintiff was a resident of 11 Stanhope Street and investigated him as a suspect. (*Id.* at 103:12-25). At this point, there was nothing tying Plaintiff to Jane Doe's attack other than Darvey's statement. (*Id.* at 123:3-7). Although the sketch and video of the attacker were distributed around the neighborhood (*id.* 91:9-12, 141:11-12), Roman was unable to recall anyone who identified Plaintiff as the suspect based on those materials (*id.* at 142:5-16).[6]

What happened next is heavily disputed, but a reasonable trier of fact, weighing the conflicting evidence and resolving all ambiguities and credibility determinations in Plaintiff's favor, could infer that the following events transpired.

At approximately 1:20 p.m. on September 3, 2013, Roman showed Jane Doe a photo array of six persons, including Plaintiff. (Pl. Ex. 5 (Photo Array Viewing Report)). She did not identify Plaintiff as her attacker. (*Id.*). At approximately 1:40 p.m., twenty minutes after the

_____

[5] 11 Stanhope Street was Plaintiff's address at all relevant times. (Grant Dep. at 19:3-4).

[6] The following was testified to at Roman's deposition:

Q:    Did you show the video to anybody who told you that's Philip Grant?
A:    The video and that person said that's Philip Grant?
Q:    Yes.
A:    I don't recall.
Q:    Did you ever show the sketch to anyone who said that looks like Philip Grant?
A:    No, not using the name Philip Grant. No.
Q:    Did you ever show the sketch to anyone who said that looks like someone at 11 Stanhope Street?
A:    No.

(Roman Dep. at 142:5-16).

photo array, Roman and Gutierrez drove Jane Doe around the area. (Pl. Ex. 9 (Gutierrez DD5, No. 27)). Jane Doe was explicitly instructed to point out anyone who fit the description of her attacker. (Def. Ex. M (Gutierrez DD5, No. 28); Roman Dep. at 106:14-19). At 1:45 p.m., Gutierrez received a call from Detective Sara Mathers requesting that she and Roman bring Jane Doe to Stanhope Street. (Def. Ex. M; Roman Dep. at 102:6-103:3; Mathers Dep. at 51:19-24). Roman's understanding was that Mathers, who was presently at Stanhope Street (Mathers Dep. at 51:19-21), made this call because she had just seen someone emerge from Plaintiff's residence (Roman Dep. at 108:22-109:9). The car arrived on Stanhope Street within "[m]inutes." (*Id.* at 107:3). It first passed by several black males walking on either side of the street, but Jane Doe did not say anything. (*Id.* at 107:3-10, 108:3-5). The car then passed by Plaintiff, who was standing or sitting in front of 11 Stanhope Street. (*Id.* at 107:10, 108:11-19). Upon seeing Plaintiff, Jane Doe shouted, "That's him. That's him. That's him." (*Id.* at 107:10-11). With that identification, Roman and Gutierrez exited the vehicle and arrested Plaintiff. (*Id.* at 109:21-25; Def. Ex. M).[7]

---

[7] Roman was the only witness who testified to Jane Doe identifying Plaintiff. The day after the arrest, a DD5 report was completed by Gutierrez, corroborating much of Roman's deposition testimony and adding that, after Plaintiff was apprehended, Gutierrez went back to the vehicle, where Jane Doe told her that she was "positive" Plaintiff was her attacker. (Def. Ex. M). Roman did not testify to this confirmatory identification. At Gutierrez's deposition, she claimed that she was unable to remember virtually any details surrounding these events. She testified that she could not remember whether she took any police action in connection with the information received from Darvey (Gutierrez Dep. at 42:9-11), whether she was present during Plaintiff's arrest (*id.* at 42:18-19), or whether Jane Doe ever identified the person who attacked her (*id.* at 44:11-13). Plaintiff's counsel showed Gutierrez a copy of her own DD5 report in an attempt to refresh her recollection; even after this, however, Gutierrez testified that her recollection was not refreshed. (*Id.* at 45:15-20). In light of this testimony, genuine issues of fact exist as to whether this confirmatory identification ever occurred. For summary judgment purposes, this question of fact must be resolved in Plaintiff's favor.

Plaintiff was transported to the Special Victims Squad in Brooklyn where he was interrogated, repeatedly professing his innocence. (Grant Dep. at 90:9-10, 106:3-8). Gutierrez, Roman and Quinones all participated in the interrogation. (Def. Ex. P (Quinones DD5, No. 24); Def. Ex. Q (Roman DD5, No. 29)). During the interview, Plaintiff brought up an unrelated incident that occurred the previous week—*i.e.*, the week of Jane Doe's assault—in which he was assaulted and chased away by two men near Evergreen Avenue. (Def. Exs. P, Q; Roman Dep. at 123:23-24, 124:9-18). At the time of his questioning, Plaintiff could not recall whether this altercation occurred on the same night as the assault being investigated. (Def. Ex. P). At this point in the interview, Quinones[8] asked Plaintiff whether he "could have seen" Jane Doe that day when he was running down the block. (Grant Dep. at 100:6-15). Plaintiff replied, "I don't know who was on the block. … I could have seen her. If she was on the block, she could have seen me. Because anybody could have been on the block." (*Id.* at 100:19-24). Quinones told Plaintiff to "just say that you could have seen her" and began writing down a statement for Plaintiff to sign. (*Id.* at 108:13-20). Plaintiff responded that the incident happened in the daytime, but Quinones responded, "oh, don't worry about that. Don't worry about that," adding, "I'm just going to put down here that you could have seen [her]." (*Id.* at 108:21-25). Quinones then wrote out a statement reciting that Plaintiff was attacked by two men "at night" and that while he was running toward Evergreen Avenue he "pass[ed] the white girl." (Def. Ex. R (Statement); Def. Ex. P). Plaintiff signed the statement because Quinones told him that if he did so he would be

---

[8] In his deposition, Plaintiff refers to certain acts taken by a female detective but does not identify her by name. This female detective is the same one that wrote out Plaintiff's statement and had him sign it. (Grant Dep. at 108:15, 109:5-10). Quinones' DD5 report establishes that she was this detective. (Def. Ex. P).

allowed to go home. (Def. Ex. R; Grant Dep. at 110:9-111:20). Plaintiff also signed a photograph of Jane Doe identifying her as the "white girl" he saw. (Def. Ex. P).[9]

A police report has been produced in this case showing that Plaintiff was assaulted near Evergreen Avenue and Stanhope Street on August 25, 2013—more than one day *before* the August 27, 2013 assault of Jane Doe. (Pl. Ex. 10). The August 25, 2013 incident occurred during the daytime, consistent with what Plaintiff told Quinones. (*Id.*).[10]

Following the interrogation, the matter was referred to the Kings County District Attorney's Office. The Assistant District Attorney assigned to the case spoke to Roman, Quinones, Jane Doe, and Jane Doe's boyfriend. (Def. Exs. H, I; Zipkin Dep. at 9:18-21). The ADA did not speak to Gutierrez. (Zipkin Dep. at 13:21-23). Quinones[11] told the ADA that Plaintiff made the following verbal statement: "[Grant] states in substance that [Jane Doe] looks familiar. [Grant] saw [Jane Doe] on street. [Grant] was running because he was being chased by

---

[9] Quinones' DD5 report portrays a conflicting version of this exchange. According to the report, Plaintiff verbally admitted to Quinones that he "saw the white girl," *viz.*, Jane Doe, while running down Evergreen Avenue. (Def. Ex. P). The report does *not* state that this admission was in any way prompted by Quinones. (*Id.*). According to the report, Quinones asked Plaintiff to sign a written statement after this verbal admission. (*Id.*). For summary judgment purposes, to the extent there is a conflict between Quinones' and Plaintiff's accounts, this question of fact must be resolved in Plaintiff's favor.

[10] The police report shows that the August 25, 2013 attack occurred at 7:15 p.m. (Pl. Ex. 10). The Court may take judicial notice of the fact that this was before sunset. *See* https://www.timeanddate.com/sun/usa/brooklyn?month=8&year=2013 (accessed Mar. 1, 2019) (sunset in Brooklyn on August 25, 2013 was at 7:38 p.m.).

[11] This information appears on a "Complaint Room Screening Sheet" prepared by the ADA, with a notation that the statement was made orally to Quinones. (Def. Ex. H; Zipkin Dep. at 9:22-24). The statement appears as part of a list of other statements, which the ADA testified were transmitted to her by Roman and Quinones. (Zipkin Dep. 15:13-15). Because this particular statement was made to Quinones, a reasonable trier of fact could infer that it was Quinones who transmitted it to the ADA.

a group of young Hispanics. He was on Evergreen running toward Bushwick." (Def. Ex. H).

Quinones also gave the ADA Plaintiff's written statement that he "saw the white girl."[12] In

addition, Roman falsely[13] told the ADA that she and Gutierrez "showed the video and sketch to

several individuals in the neighborhood who stated they recognized the individual as [Grant]."

(*Id.*; Zipkin Dep. at 13:10-23).

Based on this information, the ADA drafted a criminal complaint against Plaintiff. (Def.

Ex. S (Complaint)). At arraignment, the prosecution disclosed its intention to use Plaintiff's

statement at trial. (Pl. Ex. 12). Plaintiff was thereafter detained at Riker's Island. (Grant Dep. at

119:3).

On September 9, 2013, Plaintiff was indicted by a grand jury. (Def. Ex. T (Indictment)).

The grand jury was informed of Plaintiff's purported statement to Quinones that Jane Doe "looks

familiar" and that he "saw" her on the street. (Pl. Ex. 11 (Grand Jury Synopsis Sheet)). The

grand jury was also informed that a photo array was administered which failed to produce a hit,

and that Jane Doe "pointed out" Plaintiff during a "canvas" [*sic*] with Roman. (*Id.*). However,

certain key details may have been omitted from what was presented to the grand jury. There is no

record of the grand jury being informed of the substantial physical differences between Plaintiff

and the suspect; the fact that Plaintiff was only investigated because a witness (Darvey) was

given an inaccurate physical description of the suspect; or the fact that the identification took

---

[12] Per the ADA's testimony, this statement must have been passed to her by either Roman or
Quinones. (Zipkin Dep. at 15:13-15). Because it was Quinones who took Plaintiff's statement, a
reasonable trier of fact could infer that it was also she who passed the statement to the ADA.

[13] As described above, Roman could not recall anyone identifying Plaintiff based on the video or
sketch. (Roman Dep. at 142:5-16). Furthermore, Roman testified that, at the time of Plaintiff's
arrest, the sole evidence of his culpability was the victim's identification. (*Id.* at 123:3-7). From
this, a reasonable trier of fact, drawing all inferences in Plaintiff's favor, could find that Roman's
statement to the ADA was false.

place less than half an hour after the photo array. Although the grand jury was informed that the police possessed a video of the suspect (*id.*), there is no indication that the video was played for the grand jury, or that the grand jury was otherwise aware that the video depicted a man whose appearance was very different from Plaintiff's (Def. Ex. W at 4:19-24).

On November 27, 2013, the Office of the Chief Medical Examiner concluded tests of DNA that had been found on Jane Doe's belongings, presumably from her attacker. (Def. Ex. V (Office of the Chief Medical Examiner Laboratory Report)). The DNA did not match Plaintiff's. (*Id.*).

On July 25, 2014, the prosecution, citing the questionably valid identification of Plaintiff and other deficiencies in the investigation, moved to dismiss all of the charges. (Def. Ex. W). The charges were promptly dismissed. (*Id.* at 4:25-5:1).

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the case under governing law." *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 822 F.3d 620, 631 n. 12 (2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson*, 477 U.S. at 248). "In making this determination, the Court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Id.* (citations and internal quotation marks omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed" to the extent that a jury could reasonably believe it. *Id.* Conversely, "the court … must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## II.    False Arrest

The elements of a cause of action for false arrest under New York law are (1) intentional confinement by the defendant, (2) of which the plaintiff was aware, (3) to which the plaintiff did not consent, and (4) which was not otherwise privileged. *See Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975). The same elements apply for a false arrest action under § 1983 and the Fourth Amendment. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Only the fourth element is disputed in this case.

### 1.    Probable Cause

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* Where, as here, an arrest is not made pursuant to a judicial warrant, the burden falls on the defendant to establish that the plaintiff's arrest was supported by probable cause. *See*

*Director General of Railroads v. Kastenbaum*, 263 U.S. 25, 27 (1923) (Taft, C.J.); *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016); *Broughton*, 37 N.Y.2d at 457.

Generally, "a law enforcement official has probable cause to arrest if he received his information from … the putative victim or eyewitness." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). However, the "officer may not disregard plainly exculpatory evidence." *Id.* Furthermore, an eyewitness identification alone cannot support probable cause if the procedure so "substantially increase[d] the dangers of misidentification" as to be "improperly suggestive" under the circumstances. *Dufort v. City of New York*, 874 F.3d 388, 348 (2d Cir. 2017) (citations and quotation marks omitted); *see also Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007).

Generally, "point-outs," where a witness spontaneously encounters the perpetrator of a crime and identifies him or her to the police, are unlikely to create a risk of misidentification and are therefore often sufficient to establish probable cause. *See U.S. v. Serna*, 799 F.2d 842, 847 (2d Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987), *overruled on other grounds*, *U.S. v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc); *Brinson v. Annetts*, No. 05-CV-5582, 2008 WL 4282617, at *8 (E.D.N.Y. Sept. 16, 2008). Nevertheless, the specific type of procedure employed in this case—where a victim is escorted or driven by police around the area of a crime and instructed to point out her attacker—bears aspects of a show-up. While vehicle canvasses such as these are not presumptively unreliable, *see Brinson*, 2008 WL 4282617, at *7-*8, they raise concerns that do not necessarily arise in the context of "true" point-outs. As the New York Court of Appeals explained in a case involving this exact type of procedure:

> An identification by a witness may be 'spontaneous' in the sense that it is unprompted, yet still be the product of a police-arranged procedure. … [T]he canvassing of the crime area in the police car was an identification procedure undertaken at the 'deliberate direction of the State.' It is

undisputed that the victim was escorted to the crime scene by police, indicating that this was a confrontation arranged *for the distinct purpose of identifying the perpetrators of the mugging* . . . . This planned identification encounter is distinguishable from those non-police-sponsored identifications resulting from mere happenstance, such as where a witness is present in police headquarters for some purpose other than to effectuate an identification, and by chance views and identifies a suspect who is being processed in another room.

*People v. Dixon*, 85 N.Y.2d 218, 223 (N.Y. 1995) (emphasis in the original) (internal citations omitted).

In this case, there exist a number of factors which, viewed in the light most favorable to Plaintiff, and taken collectively, would support a firm conviction in the mind of a reasonable juror that Plaintiff's arresting officers lacked probable cause.

First, as mentioned in the beginning of this opinion, there are no similarities between Plaintiff's appearance and that of the suspect, none whatsoever which could reasonably be supported by the record, other than the fact that they are both black. Beyond that, the differences are vast. Notably, the suspect was described as being much shorter than Plaintiff and had a distinct facial deformity, which at least one other witness was able to corroborate based on the sketch. Plaintiff is also significantly older than the suspect and walks with a limp or gait which the suspect did not have. Of course, inconsistencies between initial witness statements and the details revealed by investigation are inevitable and do not automatically negate probable cause. *See Norwood v. Mason*, 524 Fed.Appx. 762, 765 (2d Cir. 2013) (summary order); *Davenport v. City of New York*, No. 15-CV-5890, 2017 WL 4356883, at *12 (E.D.N.Y. Sept. 28, 2017). But this case is different. The detectives were not only in possession of the victim's *description* of the suspect; they had *video* of him as well. As the prosecutor stated on the record in dismissing the charges against Plaintiff, "the person on [the video] seems to be much shorter than [Plaintiff], much younger than [Plaintiff], and doesn't have the pronounced limp … that [Plaintiff] has."

(Def. Ex. W at 4:20-24). This amounted to concrete evidence, uncorrupted by the follies of human memory or perception, that Plaintiff was not the attacker.

Second, the reliability of Jane Doe's identification may be called into question because, a mere half an hour beforehand, she was shown a photo array containing Plaintiff's photograph and failed to identify him as the culprit. A robust body of social science research has shown that witnesses who are confronted with an image of an innocent person are more likely to misidentify that same person in a subsequent confrontation, *see* Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 8 (2009) (collecting studies); Kenneth A. Deffenbacher, Brian H. Bornstein & Steven D. Penrod, *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 299 (2006) (meta-analysis shows that the risk of misidentifying an innocent person in a lineup increases from 15% to 37% if the witness sees the innocent person in a prior mugshot, which "supports the hypothesis that mugshot exposure increases the false alarm rate at a subsequent lineup"), and numerous courts have acknowledged this phenomenon, *see Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012); *Dennis v. Secretary, Pennsylvania Department of Corrections,* 834 F.3d 263, 327-329 (3d Cir. 2016) (McKee, J., concurring); *DaCosta v. Tranchina*, 281 F.Supp.3d 291, 302 (E.D.N.Y. Dec. 12, 2017), *appeal filed*, No. 18-95 (2d Cir.); *Jacobs v. City of Milwaukee Police Dept.*, No. 14-CV-1016, 2015 WL 5131131, at *8 (E.D. Wis. Sept. 1, 2015); *Commonwealth v. Gomes*, 470 Mass. 352, 375-376, 22 N.E.3d 897 (Mass. 2015); *State v. Henderson,* 208 N.J. 208, 255-256, 27 A.3d 872 (N.J. 2011). In this case, the exposure to Plaintiff's photograph may have predisposed her to affirmatively identify Plaintiff less than half an hour later, when she viewed the same man during the canvass.

Of course, a witness identification is not categorically unreliable solely because the witness failed to identify the suspect in a prior photo array, provided that there is "no additional evidence [suggesting] that [the] identification was mistaken or fabricated." *Celestin v. City of New York*, 581 F.Supp.2d 420, 431-432 (E.D.N.Y. 2008). But it is a factor that cuts against a finding of probable cause. *See DaCosta*, 281 F.Supp.3d at 309-310.

Third, Plaintiff's name would have never surfaced in the investigation were it not for Darvey's initial statement that the man the detectives were looking for "could be Phil." This lead was unreliable, as it was based on incomplete and inaccurate information provided by the detectives. Roman and Gutierrez's description of the person they were looking for as "tall" did not apply to the suspect, but it did apply to Plaintiff, and explains why Darvey said that the man "could be Phil." There is no indication that the detectives provided other information, such as the suspect's age or facial deformity, upon which Darvey's tentative identification could be based, nor was she shown the sketch or video of the suspect. In any event, Darvey's statement was a grossly insufficient basis to regard Plaintiff as a suspect; it provided the detectives with no more basis to suspect Plaintiff of being the attacker than any other "tall" black man. "It has long been established … that when the description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins*, 478 F.3d at 90. The officers should have known that Plaintiff's name did not surface as a result of any bona fide connection to the attack; for all intents and purposes, he was selected at random.

Collectively, these facts would have put Plaintiff's arresting officers on notice that they might have arrested the wrong man, vitiating probable cause.

2. <u>Personal Involvement</u>

The preceding analysis shows that a reasonable juror could find Plaintiff's arrest to be lacking in probable cause. The remaining question is which individual Defendants may be held liable. As Plaintiff's arresting officer, there is no dispute that Roman is a proper Defendant for the false arrest claim. However, Defendants argue that Roman is the *only* individual who may be held liable.

An individual defendant may be held liable for false arrest only if he or she was personally involved and actually and proximately caused the unlawful arrest. *See Annan v. City of New York Police Dept.*, No. 12-CV-2702, 2014 WL 10416919, at *16 (E.D.N.Y. Sept. 9, 2014), *report and recommendation modified on other grounds and adopted as modified*, 2015 WL 5552271 (Sept. 18, 2015), *reconsideration denied*, 2015 WL 9581812 (E.D.N.Y. Dec. 29, 2015); *Sherman v. County of Suffolk*, 71 F.Supp.3d 332, 357 (E.D.N.Y. 2014); Restatement (Second) of Torts §§ 9, 37 (1965).

In this case, a genuine dispute of fact exists as to Gutierrez's level of personal involvement in Plaintiff's arrest. While she is not listed on the arrest report as Plaintiff's arresting officer (Def. Ex. O), her DD5 report states that both she and Roman "apprehend[ed]" Plaintiff. (Def. Ex. M). *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (section 1983 "does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights [by] helping others to do the unlawful acts").

However, Plaintiff's false arrest claim must fail against Quinones. Critically, there is no evidence that Quinones was at the scene of the arrest, or that she was even involved in the canvass and show-up that led to the arrest. Furthermore, although Quinones was involved in the pre-arrest phase of the investigation to at least some extent (ECF No. 43 (Def. Rule 56.1 SOF) ¶

4; Pl. Ex. 7 (Quinones DD5, No. 22)), there is no evidence that she took any action which might foreseeably have caused Plaintiff to suffer an unconstitutional arrest. *Cf. Rhooms v. City of New York*, No. 11-CV-5910, 2017 WL 1214430, at *7 (E.D.N.Y. Mar. 31, 2017).

For the foregoing reasons, summary judgment as to the false arrest claims is denied as to Defendants Roman and Gutierrez and granted as to Defendant Quinones.

## III.     Due Process Claims

Liberally construed, Plaintiff's due process claim is based on the fabrication of evidence. To prevail on a claim based on fabrication of evidence, a plaintiff must demonstrate that (1) an investigating official, (2) has fabricated evidence (3) that is material, (4) forwards that information to prosecutors, and (5) thereby causes plaintiff to suffer a deprivation of liberty. *See Garnett v. Undercover Officer C0039,* 838 F.3d 265, 279 (2d Cir. 2016); *Cook v. City of New York*, 243 F.Supp.3d 332, 351 (E.D.N.Y. 2017); *Soomro v. City of New York*, 174 F.Supp.3d 806, 815-816 (S.D.N.Y. 2016). An officer may be liable if he or she affirmatively submits falsified evidence, such as a false confession, to the authorities, *see Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997), or withholds material information that, if disclosed, would cause prosecutors to doubt whether charges should be filed, *see Bermudez v. City of New York*, 790 F.3d 368, 374-376 (2d Cir. 2015). Evidence is material if it would "likely … influence a jury's decision" in a criminal proceeding against the plaintiff. *Garnett*, 838 F.3d at 280; *see Soomro v. City of New York*, 174 F.Supp.3d at 815-816.

A period of post-arraignment confinement caused by the prosecutor's decision to bring charges suffices as a deprivation of liberty for purposes of a due process claim. *See Garnett,* 838 F.3d at 277. There is no dispute that Plaintiff suffered a deprivation of liberty. To establish causation, the plaintiff need not show that "the falsified information [was] the *only* reason the

plaintiff suffered a deprivation of his liberty," *Garnett*, 838 F.3d at 277 (emphasis in the original), but only that it was a "substantial factor in bringing about the harm," *Nnodimele v. Derienzo*, No. 13-CV-3461, 2016 WL 337751, at *14 (E.D.N.Y. Jan. 27, 2016) (citations and internal quotation marks omitted), and that the harm was a "reasonably foresee[able] consequence" of the defendant's actions, *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000). On summary judgment, materiality and causation merge; if evidence is material, then this will usually suffice to raise an issue of fact as to whether it contributed to the decision to initiate criminal proceedings. *See Dufort*, 874 F.3d at 352 (failure by defendants to inform prosecutors of facts rendering eyewitness identification unreliable raised a triable issue of fact as to causation); *Bermudez*, 790 F.3d at 376 (holding that, for purposes of summary judgment, plaintiff raised a triable issue of fact as to proximate causation where a jury could find that the defendant "prevented [the prosecutor] from making an informed decision about the reliability of [the] evidence [against the plaintiff]"); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 98 n. 11 (S.D.N.Y. 1981) ("materiality supports causation" in that decisionmakers are unlikely to be "indifferent" to material information).

In this case, a reasonable trier of fact could find that Roman knowingly submitted false, material evidence to the ADA. Specifically, Roman told the ADA that individuals in the neighborhood identified Plaintiff as Jane Doe's attacker based on the sketch and/or video of the suspect. But in her deposition testimony, Roman was unable to recall anyone who identified Plaintiff from these materials, and from this a reasonable trier of fact, drawing all inferences in Plaintiff's favor, could conclude that no such identification occurred. Furthermore, Roman affirmatively testified that there was no evidence linking Plaintiff to the crime at the time of his arrest other than Jane Doe's identification. The materiality of this information cannot reasonably

be disputed—if there had indeed been another individual who recognized Plaintiff, then this would have been valuable independent corroboration of Jane Doe's eyewitness identification— and this raises a genuine issue of fact as to whether this information contributed to the decision to prosecute.

A reasonable trier of fact could also find Quinones knowingly submitted false, material evidence to the ADA. Specifically, the record supports a finding that she passed along Plaintiff's written statements that he "saw" Jane Doe while being chased down Evergreen Avenue. As previously noted, the assault that Plaintiff described in his written statement occurred on August 25, 2013, not on August 27, 2013 when Jane Doe's assault occurred. From this fact, a jury could find that Plaintiff's written statement was false—that he never saw Jane Doe at all, and only made this admission only because Quinones pressed him and assured him that he would be able to go home. Furthermore, Plaintiff testified that he told Quinones the altercation occurred during the "daytime" (consistent with the police report subsequently produced in this case) and that Quinones told him, "don't worry about that" before having him sign the statement that he saw Jane Doe "at night." Under these circumstances, the record could support a finding that Quinones furnished Plaintiff's written statement to the ADA with knowledge that it was false, or, at the very least, without disclosing the heavily suggestive circumstances under which it was procured.

Quinones also told the ADA that Plaintiff made a verbal admission that Jane Doe "looked familiar" and that he "saw" her while running down Evergreen Avenue. Quinones' DD5 report states that Plaintiff made an oral statement to this effect. However, this is inconsistent with Plaintiff's testimony; according to Plaintiff, he merely said that "anybody could have been on the block," or words to that effect. A trier of fact could choose to credit Plaintiff's testimony and discredit Quinones' DD5 report, particularly since, as explained above, the jury could find that

Plaintiff never saw Jane Doe, and could presume that he would not voluntarily admit to seeing someone he did not see. Under these circumstances, a juror could find that Quinones submitted falsified evidence to the ADA by passing along a verbal statement that Plaintiff never made.

A jury could find that the written and verbal statements that Plaintiff "saw" Jane Doe, possibly on the night of her assault, were material and influenced the decision to prosecute. While they did not directly incriminate him, they could be used to bolster the credibility of Jane Doe's identification of him by showing that his connection to Jane Doe was not purely coincidental. That this statement was material is further evidenced by the fact that the prosecution announced its intent to introduce it at trial, as well as the fact that it was disclosed to the grand jury.

Plaintiff's due process claim against Gutierrez, however, fails as a matter of law. As with other § 1983 claims, the "personal involvement of a defendant is a prerequisite to liability" for a due process claim. *Jean-Laurent v. Bowman*, No. 12-CV-2954, 2014 WL 4662221, at *13 (E.D.N.Y. Jul. 7, 2014), *report and recommendation adopted*, 2014 WL 4662232 (E.D.N.Y. Sept. 18, 2014). Here, there is no evidence that Gutierrez ever spoke to the ADA, let alone fabricated or withheld evidence from her.

Therefore, summary judgment as to the § 1983 due process claim will be denied as to Roman and Quinones and granted as to Gutierrez.

## IV.    Malicious Prosecution Claims

In order to prevail on a claim for malicious prosecution pursuant to § 1983, a plaintiff "must establish the elements of a malicious prosecution claim under state law," namely, "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and

(4) actual malice as a motivation for defendants' actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-161 (2d Cir. 2010) (citations and internal quotation marks omitted).

1. <u>Initiation of a Criminal Proceeding and Actual Malice</u>

There is significant overlap between a claim based on malicious prosecution and a due process claim based on fabricated evidence. For purposes of the first element of a malicious prosecution claim, the submission of falsified evidence or withholding of material evidence is deemed to be an "initiation" of a criminal proceeding, *see Dufort*, 874 F.3d at 352-353; *Manganiello*, 612 F.3d at 163; *Ricciuti*, 124 F.3d at 130; *Stukes v. City of New York*, No. 13-CV-6166, 2015 WL 1246542, at *9 (E.D.N.Y. Mar. 17, 2015); *Levy v. City of New York*, 935 F.Supp.2d 575, 588-589 (E.D.N.Y. 2013); *Myers v. County of Nassau,* 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011), at least where the plaintiff can show that the defendant "knew or should have known" that doing so would cause plaintiff to be prosecuted, *Torres v. Jones*, 26 N.Y.3d 742, 767 (N.Y. 2016). Such conduct also satisfies the element of actual malice. *See id*. at 762 ("[T]he plaintiff may show malice … with proof that the defendant falsified evidence in bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause").

Here, because a reasonable jury could find both Roman and Quinones liable for a due process violation based on fabricated evidence, *see* Discussion III, *supra*, it could also find that the first and fourth elements of Plaintiff's malicious prosecution claim are satisfied as to these Defendants.

Plaintiff's malicious prosecution claim against Gutierrez, however, fails as a matter of law, as there is no evidence that Gutierrez had any communication with prosecutors or testified before the grand jury. *See Levy,* 935 F.Supp.2d at 588 ("a plaintiff usually cannot show arresting

officers initiated a criminal proceeding against him solely based on an arrest"); *Smith v. City of New York*, No. 04-CV-3286, 2010 WL 3397683, at *9 (S.D.N.Y. Aug. 27, 2010) (granting summary judgment as to malicious prosecution claim where "[n]othing in the record suggest[ed] that [the defendant police officer] discussed the arrest with an ADA, or that he testified before the grand jury").

2. Probable Cause

Unlike a due process claim based on fabricated evidence, a malicious prosecution claim requires proof that the defendant lacked probable cause to prosecute. However, a lack of probable cause to arrest will necessarily imply a lack of probable cause to prosecute unless new evidence of the plaintiff's culpability is discovered between arrest and prosecution. *See Dufort*, 874 F.3d at 351; *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999); *Mejia v. City of New York*, 119 F.Supp.2d 232, 254 (E.D.N.Y. 2000). Here, a jury could find that there was no probable cause to arrest Plaintiff, *see* Discussion II.1, *supra*, and that no new evidence of culpability was discovered during the post-arrest period. Although Plaintiff signed a statement during his interrogation admitting that he "saw" Jane Doe, a jury could find, for the reasons previously discussed, that the officers knew this statement to be false, or at least highly dubious. *See* Discussion III, *supra*. Accordingly, this statement, whatever its probative value, did not supply probable cause to initiate criminal proceedings against Plaintiff.

Indictment by a grand jury creates a rebuttable presumption of probable cause under New York law. *See Dufort*, 874 F.3d at 352; *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "The rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly." *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. 1983); *see also DaCosta*, 281 F.Supp.3d at 305 ("[T]he presumption of probable cause created by a

grand jury indictment is premised on the fact that a regularly operating grand jury's decision based on the facts and circumstances should be respected"). However, the presumption that the grand jury has acted "regularly," and hence the basis for deferring to its finding of probable cause, is vitiated if it can be shown that "the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Dufort*, 874 F.3d at 352 (quoting *Savino*, 331 F.3d at 72); *see also DaCosta*, 281 F.Supp.2d at 304 ("[W]hen evidence of known dubious value—whether a potentially falsified confession, or an unreliable eyewitness identification—is presented to the grand jury, and the grand jury is not apprised of its limited probative value, the presumption of probable cause created by the indictment is rebutted").

Here, any presumption of probable cause generated by the grand jury's indictment is negated by the fact that the grand jury received, and their deliberations were therefore potentially corrupted by, Plaintiff's statement that he "saw" Jane Doe—a statement that the jury could find was passed on by Quinones despite knowledge of its falsity. *See Torres*, 26 N.Y.3d at 767-768 (manufacturing a false statement by plaintiff sufficient to rebut the presumption of probable cause). Furthermore, Plaintiff has "at least established a question of material fact as to whether … the grand jury [was] aware of the limited nature of [Jane Doe's] identification and the highly suggestive manner in which it was procured." *Dufort*, 874 F.3d at 353. Hence, a genuine dispute of fact exists as to whether the grand jury was deprived of the "complete and full statement of [the] facts" necessary to support the presumption of probable cause. *DaCosta*, 281 F.Supp.3d at 311 (quoting *Colon*, 60 N.Y.2d at 83); *see Dufort*, 874 F.3d at 353.

Accordingly, summary judgment as to the § 1983 and state law malicious prosecution claims will be denied as to Quinones and Roman and granted as to Gutierrez.

## V. Municipal Liability

Plaintiff brings a state law malicious prosecution claim against the City of New York. Unlike a claim pursuant to § 1983, a state law malicious prosecution claim may be brought against a municipality under a theory of respondeat superior. *See Bailey v. City of New York*, 79 F.Supp.3d 424, 451 (E.D.N.Y. 2015); *Williams v. City of White Plains,* 718 F.Supp.2d 374, 381 (S.D.N.Y. 2010); *cf. Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Where genuine issues of material fact exist as to whether individual defendants employed by the City are liable for malicious prosecution, summary judgment with respect to malicious prosecution claims against the City should be denied. *See Sankar v. City of N.Y.*, 867 F.Supp.2d 297, 313 (E.D.N.Y. 2012). Because summary judgment is denied in part as to the malicious prosecution claims against Roman and Quinones, *see* Discussion IV, *supra*, it is also denied as to the state law malicious prosecution claims against the City.

## VI. Qualified Immunity

Defendants argue that they are entitled to summary judgment on grounds of qualified immunity. This argument must be rejected.

"[A] police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins*, 478 F.3d at 87 (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)). It goes without saying that the right to be free of false arrest, malicious persecution, or deprivations of liberty caused by fabricated evidence are all clearly established constitutional rights. *See Ricciuti*, 124 F.3d at 128, 130.

For purposes of qualified immunity in the context of false arrest claims, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.' " *Jenkins*, 478 F.3d at 87 (quoting *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). Defendants contend that, "[e]ven assuming, *arguendo*, that defendants lacked probable cause to arrest plaintiff, the individual defendants are, nonetheless, entitled to qualified immunity … because his arrest was supported, at a minimum, by arguable probable cause," that is to say, "an officer of reasonable competence could have concluded that the probable cause test had been met." (ECF No. 42 at 8, 10) (citations, internal quotation marks and alterations omitted).

The suggestion that qualified immunity imposes a different standard of "objective reasonableness" than that of probable cause is most curious. Probable cause, as has been stated numerous times by the Supreme Court and the Second Circuit, is already evaluated from the standpoint of an "objectively reasonable police officer." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017), *cert. denied*, 139 S.Ct. 61 (2018); *Mitchell*, 841 F.3d at 77; *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012), *cert. denied*, 568 U.S. 1212 (2013). Is there any difference between the "objective reasonableness" standard employed in the qualified immunity test and that of a traditional probable cause analysis? Figuring out whether the "officer[] of reasonable competence" contemplated for purposes of qualified immunity, *Jenkins*, 478 F.3d at 87; *Lennon*, 66 F.3d at 423, is any different from the "objectively reasonable

police officer" contemplated for purposes of probable cause, *Wesby*, 138 S.Ct. at 586; *Pringle*, 540 U.S. at 371, is surely a challenge befitting Alice in Wonderland.[14]

"The critical distinction between the probable cause and qualified immunity determination … is that qualified immunity is reserved for those instances where, even assuming the truth of the facts as submitted by the plaintiff, the allegedly violated right protected under the law is not 'clearly established' in that factual setting." *Jones v. Marcum*, 197 F.Supp.2d 991, 1000 n. 6 (S.D. Ohio 2002); *see also Saucier v. Katz*, 533 U.S. 194, 214-215 (2001) (Ginsburg, J., concurring in the judgment); *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir. 1996) (Posner, J.) ("The modern conception of [qualified] immunity is … designed to protect public officers from their failures to anticipate changes in the law"). Accordingly, "[w]here the only issue bearing on immunity is whether the defendant had probable cause to make the search or arrest that is challenged, merits and immunity merge; the dispositive question is simply whether the defendant did have probable cause." *Boyce*, 77 F.3d at 948; *Mahoney v. Kesery*, 976 F.2d 1054, 1057-59 (7th Cir. 1992) (Posner, J.); *Jones*, 197 F.Supp.2d at 1000 n. 6; *Corcoran v. Fletcher*, 160 F.Supp.2d 1085, 1089-1090 (C.D. Cal. 2001).

In this case, there is a genuine dispute of material fact as to probable cause, *see* Discussion II.1, *supra*, and the right allegedly violated was clearly established. Accordingly, Defendants' qualified immunity defense as to the false arrest claim must fail. But even if

---

[14] " 'When I use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'

" 'The question is,' said Alice, 'whether you can make words mean so many different things.'

" 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.'"

Lewis Carroll, *Through the Looking-Glass* (1871).

qualified immunity were to somehow impose a lower standard of reasonableness than probable cause, the result would not be different. The facts set forth above, viewed in the light most favorable to the Plaintiff, could support a finding that no officer of reasonable competence would find probable cause to detain Plaintiff.

Nor are Defendants entitled to qualified immunity with respect to the due process and malicious prosecution claims. As previously explained, these claims are based on conduct which, a jury could find, amounted to the deliberate fabrication of evidence. *See* Discussion III-IV, *supra*. Such conduct, if proven, is unreasonable as a matter of law. *See Ricciuti*, 124 F.3d at 129, 130.

## VII. Plaintiff's Abandoned Claims

Plaintiff has abandoned all claims against Montagano and all claims against the City, other than the state law malicious prosecution claim discussed above. (ECF No. 47, at 1). Accordingly, summary judgment as to Plaintiff's remaining claims against Montagano and the City is granted.

## CONCLUSION

Defendants' motion for summary judgment with respect to Defendant Roman is **DENIED** as to all claims. The motion with respect to Defendant Gutierrez is **DENIED** as to the false arrest claim and **GRANTED** as to all remaining claims. The motion with respect to Defendant Quinones is **DENIED** as to the due process and malicious prosecution claims and **GRANTED** as to all remaining claims. The motion with respect to Defendant Montagano is **GRANTED** as to all claims. The motion with respect to Defendant the City is **DENIED** as to the state law malicious prosecution claim and **GRANTED** as to all remaining claims.

      SO ORDERED.

Dated:        Brooklyn, New York
               March 8, 2019

                                        /s_____
                                        I. Leo Glasser               U.S.D.J.